UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TYRELL BERRINGTON JACKSON,

    Petitioner

v.

DENNIS HARRISON, Warden    :   Civil Action No. 05-1969(RMU)

    Respondent

MOTION FOR JUDGMENT ON THE PLEADINGS
AND AFFIDAVIT IN SUPPORT

    **PLEASE TAKE NOTICE**, that upon the pleadings in this action heretofore filed herein, that petitioner, Tyrell Berrington Jackson, moves this honorable court to enter an "Order" granting the "Writ of Habeas Corpus" and the relief which petitioner seeks and grounds states the following.

    Prior to **Noble IV**, parolees (such as petitioner) in the District of Columbia (who had their parole revoked) received different sentence calculations based on whether they were under the supervision of the D.C. Board of Parole or the U.S. Parole Commission. Petitioner was in the group that was under the supervision of the D.C. Board of Parole, and therefore was entitled to **street time credits** when their parole was revoked.

    Because petitioner was always under the supervision of the D.C. Board of Parole, and because the D.C. Board of Parole consistently followed D.C. Code § 24-431, and D.C. Municipal Regul-

ation, Title 28 § 601.7, and was awarding D.C. parolees with credit for their "street time," therefore petitioner had a legitimate expectation of receiving credit for "street time" when his parole was revoked by the D.C. Board of Parole (See Exhibit A). Therefore, constitutional implications are raised by the application of "Noble IV" to petitioner, especially where the broader issue of the Noble case was fully briefed and argued, United States Parole Commission v. Noble, 711 A.2d 85 (D.C. 1998)(en banc), reinstating 693 A.2d 1084 (D.C. 1997) and it was made clear at the December 9, 1998 hearing that the D.C. Dept. of Corrections, the D.C. Board of Parole or the U.S. Parole Commission where to apply "Noble IV" retroactively to those parolees who were under D.C. supervision from 1987 to April 23, 1998. See Noble v. U.S. Parole Comm'n, 32 F.Supp.2d 11, 14 (D.D.C. 1998). The Court stated that this group of parolees clearly had the right to rely on the District of Columbia's prior interpretation of its own laws. Noble, supra, 32 F. Supp.2d at 14.

**NOTICE REQUIREMENT AT PAROLE REVOCATION HEARING.**

A parole revocation hearing is subject to minimal constitutional due process protections, which include: (1) written notice of claimed violations of parole; (2) disclosure of evidence against parolee; (3) opportunity to be heard in person and to present witnesses and documentary evidence; (4) right to confront and cross-examine adverse witnesses, unless hearing officer specifically finds good cause for not allowing confrontation; (5) neutral and detached hearing body such as traditional parole board, members of which need not be judicial officers or lawyers; and (6) written

-2-

statement by factfinders as to evidence relied on and the reasons for revoking parole.

Petitioner states that he was never informed by the D.C. Board of Parole on October 26, 1998 at his initial revocation hearing that he would not be credited with all of his "**street time**" upon revocation of his parole, nor did the U.S. Parole Commission inform petitioner at his "Reconsideration Hearing" on November 15, 1999, where petitioner was granted parole, that all of his "**street time**" would not be credited to his sentence. Furthermore, petitioner never received the D.C. Dept. of Corrections "**May 1998 Notice To All Inmates**" stating that based on the decision of **Noble**, that the Bureau of Prisons and the D.C. Dept. of Corrections were obligated to correct their sentence calculations by withdrawing credit for all time spent on parole.

Petitioner avers that when he was released on parole on August 12, 2002, that none of the conditions cited for parole violation stated that upon revoking parole, that all of petitioner's "**street time**" would be forfeited, so therefore, petitioner was never duly informed that he was not entitled to credit for all of his "**street time**" if his parole was revoked, by either the D.C. Dept. of Corrections, the D.C. Board of Parole or the U.S. Parole Commission.

Petitioner had a legitimate expectation that he would receive credit for all of his "**street time**", and this belated correction of petitioner's sentence is so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the

-3-

"Due Process Clause." DeWitt v. Ventetoulo, 6 F.3d 32, 35 (1st Cir. 1993).

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND THE ACCARDI DOCTRINE

### I. ADMINISTRATIVE PROCEDURE ACT.

In respect to agencies governed under the Administrative Procedure Act, if a court finds that substantial rights of a petitioner have been improperly prejudiced by a departure from agency procedures, then it is the function of the court to reverse or modify the order.

Petitioner states that when a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress had directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, (See generally, R. Pound, The Spirit of the Common Law 174-175 (1921), as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

"The power of an administrative agency to administer a Con-

gressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Morton v. Ruiz, 415 U.S. 19, 231, 94 S.Ct. 1055, 1072 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. INS v. Jong Ha Wang, 450 U.S. 139, 144, 101 S.Ct. 1027, 1031 (1981).

In Chevron, U.S.A., Inc. v. Natural Resources Defense, 467 U.S. 843 (1984) the court stated the following:

> "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations has been consistently followed by this Court whenever a decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. See e.g. National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997)] . . . If this choice represents a reasonable accomodation of conflicting policies that were committed to the agency›s care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accomodation is not one that Congress would have sanctioned. United States v. Skimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908 (1961).

In light of these well-settled principles it is clear that

-5-

the Court's in the <u>Noble</u> decision misconceived the nature of their role in reviewing the regulations at issue. The parsing of general terms in the text of the statute (D.C. Code § 24-431(a) will not reveal an actual intent of Congress. This language is not dispositive; the terms are overlapping and the language is not precisely directed to the question of the applicability of a given term in the context of a larger operation. To the extent any congressional "intent" can be discerned from this language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the agency's power to regulate (D.C. Dept. of Corrections) and adopt rules in order to effectuate the intent of the "Good Time Credits Act." D.C. Code § 24-431(a)

In addition, the legislative history of the Act forecloses a sharp break with D.C. Code § 24-406 (formerly § 24-206). More importantly, this history plainly identifies the policy concerns that motivated the enactment of D.C. Code § 24-431.

Significantly, it was not the D.C. Department of Corrections in the 1990's, but rather the D.C. Superior Court, the D.C. Court of Appeals, the U.S. District Court and the U.S. Court of Appeals for the District of Columbia that read the statute flexibly to allow the awarding of "street time" to D.C. offenders after parole had been revoked, and to follow D.C. law in making parole decisions. See <u>Johnson</u> v. <u>Williford</u>, 821 F.2d 1279 (7th Cir. 1987); <u>Cosgrove</u> v. <u>Thornburgh</u>, 703 F. Supp. 995; <u>Luck</u> v. <u>D.C. Parole Board</u>, 996 F.2d 372 (D.C. Cir. 1993)

-6-

When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.

Judges are not experts in the field, and are not part of either political branch of the government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the government to make such policy choices, resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities. In such a case, federal-courts who have no constituency--have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones. Our Constitution vests such responsibilities in the political branches. TVA v. Hill, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

The power of an administrative agency to administer a con-

gressionally created right necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. In the area of the District of Columbia Government, the Mayor has long been empowered to promulgate rules and policies, and the power has been given explicitly to the D.C. Corporation Counsel (now the Attorney General of D.C.) and his delegates (D.C. Dept. of Corrections, D.C. Board of Parole, etc.). This agency power to make rules that affect substantial individual rights and obligations carries with it the responsibility not only to remain consistent with the governing legislation, Federal Maritime Comm'n v. Seatrain Lines, Inc., 411 U.S. 726, 93 S.Ct. 1773 (1973), but also to employ procedures that conform to the law. See NLRB v. Wyman-Gordon Co., 394 U.S. 759, 764, 89 S.Ct. 1426, 1428, 22 L.Ed.2d 709 (1969).

The D.C. Administrative Procedure Act was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determination. That Act states in pertinent part:

> "Each Agency shall separately state and currently publish in the D.C. Register for the guidance of the public-----
> . . . . . substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency."

> "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the D.C. Register and and not so published.

Petitioner submits that the D.C. Department of Corrections and the D.C. Board of Parole failed to comply with the D.C. Administrative Procedure Act by not publishing that they were rescinding the benefits of the "**Good Time Credits Act, § 24-431(a), and Title 28 DCMR § 601.7,**" which credited parolees their "<u>street time</u>" when their parole is revoked.

In the instant case, the attack by the U.S. Parole Commission, the D.C. Dept. of Corrections and the D.C. Board of Parole, on adopted rules, regulations and poicies has placed them under the structure of the D.C. APA procedures. The Manual reads:

> <u>Code of D.C. Regulations</u>: Directives which relate to the public, including prisoners, are published in the D.C. Register and codified in 28 D.C. Municipal Regulations (Title 28 DCMR). These directives inform the public of privileges and benefits available; eligibility qualifications, requirements and procedures; and of appeal rights and procedures. They are published in accordance with rules and regulations issued by Director of the D.C. Register and the Administrative Procedure Act.

Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.

The D.C. Department of Corrections, the D.C. Board of Parole, or the U.S. Parole Commission have not presented any reasons why the requirements of the D.C. Administrative Procedure Act could not or should not have been followed with strict compliance as mandated by the directives setforth by the Act by publishing the proposed changes that were to be made to the "**Good Time Credits Act, and Title 28 DCMR § 601.7,**" which would have afforded not only the petitioner with the opportunity to make comments, objections, etc. to the changes, but it also denied the public this fundamental right.

-9-

The scope of the Act was explicitly designed for the purposes of making comments, opposing any new rules, regulations, amendments, etc., and the right to appeal any benefits or rules, regulations, that adversely affected prisoners and the general public. What the D.C. Dept. of Corrections, D.C. Board of Parole and the U.S. Parole Commission have effectively done by changing the **"Good Time Credits Act; Title 28 DCMR § 610.7,"** without following protocol, is circumvented the directives of the Act and usurped their authority.

An agency's action in violation of its own rule or regulation, which causes prejudice to the party against whom the agency has acted, is subject to vacation pursuant to the Administrative Procedure Act, when a violation of a rule of internal administrative procedure impacts a substantial right.

## THE ACCARDI DOCTRINE

The **"Accardi Doctrine,"** which traces its roots to the Supreme Court decision of <u>United States ex rel. Accardi</u> v. <u>Shaughnessy</u>, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), has been recognized in federal and some state jurisdictions. **Accardi,** however, involved much more than mere technical violations of an internal agency regulation pertaining to the orderly transaction of agency business. It involved an attempt to bypass (as is the case of the D.C. Dept. of Corrections, D.C. Board of Parole & U.S. Parole Commission) three levels of review required by the agency's regulations.

In **Accardi,** the Supreme Court reversed the denial of a request

for a writ of habeas corpus where the Attorney General disregarded applicable procedures of the Board of Immigration Appeals.

In Accardi v. Shaughnessy, supra, 347 U.S. at 268, the Supreme Court of the United States held that an administrative decision is subject to invalidation because of the agency's **'failure to exercise'** its own discretion, contrary to valid regulations. (Emphasis in original). Subsequently in a series of cases, the Supreme Court, relying on the Accardi case, has recognized a rule of federal administrative law that, with some exceptions, an administrative agency is required to follow its own procedures or regulations. See, e.g. United States v. Caceres, 440 U.S. 741, 751 n. 14, 99 S.Ct. 1465, 1471 n. 14 (1979).

It is well established that rules and regulations promulgated by an administrative agency cannot be waived, suspended or disregarded in a particular case as long as such rules and regulations remain in force . . . This rule has been recognized in federal and state jurisdictions as the "Accardi Doctrine" since it was announced in U.S. ex rel. Accardi v. Shaughnessy, supra. The Court stated:

> "When an Administrative Agency promulgates rules to govern its proceedings, these rules must be scrupulously observed. This is so even when the defined procedures are "generous beyond the requirements that bind such agency." For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate those rules. If an agency in its proceedings violates its rules and prejudice results, any action taken as a result of the proceedings cannot stand."

The federal Constitution embraces and embodies the cardinal

-11-

principle that this is a nation subject to the rule of law, and as such, agents of the government are bound to follow the law. United States v. Lee, 106 U.S. 196, 220-221 (1882). Rueters Ltd. v. Federal Communications Comm., 781 F.2d 946, 947 (D.D.C. 1986) (Accardi doctrine is a "veneral" precept "which lies at the foundation of the modern administrative state). Plausibly, the Constitution's rule-of-law requirement could be derived from Article II's admonition that the President "shall take CAre that the Laws be faithfully executed." But history, precedent, and application of the doctrine to all branches of government demonstrate that it is the fundamental concept of due process expressed in the Fifth and Fourteenth Amendments that gives life to the Accardi doctrine.

Substantive due process then is the source of the constitutional rule-of-law principle; long tradition recognizes that the Due Process Clause has as its touchstone "protection of the individual against arbitrary action of government .... whether the fault lies in a denial of fundamental procedural fairness . . or in the exercise of power without any reasonable justification in the service of a legitimate government objective. County of Sacrmento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); Daniels v. Williams, 474 U.S. 327, 330-32, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

While it can hardly be gainsaid that public officials must obey the law, in the aministrative context, a more nuanced question

arises as to what constitutes "law" binding on the agencies. The question is not posed in its broadest, jurisprudential sense. Rather the question is to what sources must a court look to determine whether a government actor is prohibited from taking the action (or inaction) alleged to have been wrongfully done (or not done).

Form should be respected. Laws enacted through formal processes clearly are binding. Thus the Constitution, statutes, and "legislative rules" that have been promulgated after public notice and comment are binding:

> "Simply stated, rules are rules, and fidelity to the rules which have been properly promulgated, consistent with applicable statutory requirements, is required of those to whom Congress has entrusted the regulatory missions of modern life. Reuters, 781 F.2d at 951

Petitioner submits that D.C. Code § 24-221.03 (formerly D.C Code § 24-431) nor Title 28 DCMR § 601.7 have been repealed or abolished, making them both still active and applicable, having the force and rule-of-law and should be applied to D.C. prisoners such as petitioner especially where neither the U.S. Parole Commission, the D.C. Department of Corrections or the D.C. Board of Parole followed the proper procedures contained in the D.C. Administrative Procedure Act, Title 1 § 1501 et. seq. when they arbitrary rescinded the benefits of awarding parolees credit for "<u>street time</u>" when their parole is revoked; in contesting these laws that the D.C. government had enacted into law.

In Yellin v. United States, 374 109, 83 S.Ct. 1828 (1963), the Supreme Court made clear that the Accardi doctrine has deeper roots and broader appliation because it also applies to Congress. cf. 5 U.S.C. § 701(b)(1)(A)(Congress is not a government agency subject to judicial review under the Adminstrative Procedure Act). In Yellin, the Court held that the House Committee on Un-American Activities had violated its procedural rules in its treatment of a witnesses's request to appear in executive session rather than in a public hearing.

The precedents through Yellin established a doctrine with a number of common features. In each case, the Court inquired into the purpose of the regulations that the agency allegedly violated, and found that the party relying on the Accardi doctrine was in the class of persons for whose benefit the regulations had been promulgated. See Yellin, 374 U.S. at 115; Vitarell, 359 U.S. at 540; Service, 354 U.S. at 373; Accardi, 347 U.S. at 268; Bridges, 326 U.S. at 152; Arizona Grocery, 284 U.S. at 389; Bilokumsky, 263 U.S. at 155-56.

The purpose for inquiring into the goal of the regulations appears to have been to support a finding that the regulation conferred a procedural "right" on the individual that had been denied by the violation. See also Mazaleski, 562 F.2d at 719. The Court explicitly or implicitly found that the individual raising the procedural non-compliance claim had been at least arguably harmed by the violation such as petitioner in the instant case has been harmed. The Court's analysis also suggests that the

-14-

doctrine functions to ensure equal treatment by governmental bodies, particularly where the agency has extended a procedural protection on a class of person. For this reason, the court, on occasion, stated that strict compliance with the regulation was required. See Yellin, 374 U.S. at 124, 83 S.C.t. 1828.

In sum, the following syllogism emerges: The Due Process Clause establishes that public officials are bound to follow the law. Agency regulations intended to be binding are law--or, if qualification need be made, have the force and effect of law as applied to the agency. Therefore, the Due Process Clause requires that agency officials follow their own rules, even thos promulgated gratuitously. See Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152 (1957).

Petitioner avers that once D.C. Code § 24-431 **was placed in the D.C. Register** and enacted into law, and **codified** in Title 28 DCMR § 601.7, these laws were the rule-of-law in the District of Columbia. The Respondents violated the **"Administrative Procedure Act, Title 1-1501 et. seq, and the "Accardi Doctrine"**, the District of Columbia Court of Appeals (711 A.2d 85) and the U.S. District Court (32 F.Supp.2d 11(D.D.C. 1998) express agreement that **Noble IV** would not be applied retroactively, by their non-compliance in not complying with the strict directives of the **D.C. Administrative Procedure Act**, and thus, have denied petitioner "Due Process and Equal Protection of the laws in violation of the Fifth Amendment to the U.S. Constitution, thereby

requiring that their actions be declared arbitrary, capricious, and fundamentally unjust and that such actions be invalidated.

**WHEREFORE**, in light of the aforementioned, petitioner moves this honorable court to issue an "Order" granting the "Writ of Habeas Corpus," and the relief so requested, as the ends of justice will be best served to the public and to petitioner.

Respectfully Subjected,

Tyrell Berrington Jackson
Reg. No. 19939-101
RCI
P.O. Box 630
Winton, NC 27986

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Motion For Judgment On The Pleadings and Affidavit in Support" has been mailed to Sherri L. Berthrong, AUSA, Special Proceedings Section, 555 4th Street, N.W., Room 10-450, Washington, D.C. 20530 this **21st** day of **March 2006.**

Embossed Hereon Is My
Hertford County, North Carolina Notary Public Seal
My Commission Expires July 12, 2010
PAMALA DAVIS

Tyrell Berrington Jackson

Exhibit A
Case No. 05-1969



# The Board of Parole
## of the
## District of Columbia



## NOTICE OF BOARD ORDER

Order # 1 of 1

In reference to:

DCDC 198-397            NAME   TYRELL B JACKSON

DOB ███            SSN ███            LOCATION   CTF

DOCKET  H9810-0039        CONSIDERATION TYPE   H:REVOCATION

The District of Columbia Board of Parole issues the following **ORDER:**

REVOKE PAROLE FOR CRIMINAL AND NONCRIMINAL VIOLATIONS;
CONSIDER FOR REPAROLE BY 08/25/1999

Implementation of this Order shall include the following:
Special Instructions for Reconsideration

COMMUNIC/CONFLICT RESOLU
INTENSIVE DRUG PROGRAM

Remarks:

ILLEG USED CONTROL-DANGER SUBSTANCE
NONCOMPLIANCE: NARC SURVEILLANCE
FAILED TO OBEY ALL LAWS
NONCOMPLIANCE: OUTPAT DRUG PROG
FAILED TO CARRY OUT PO INSTRUCTIONS

10/26/1998
Date

Seal

NOA Date  11-3-98  by  CM

_Margaret Quick_
Chairman
on behalf of the Board of Parole

[ Parole Determination File ]
DORGETT, G

EXHIBIT
D

U.S. Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

Notice of Action

**Exhibit B**
**Case No. 05-1969**

---

Name: JACKSON, Tyrell

Register Number: 00198+397          Institution: Central Detention Facility

In the case of the above-named, the following parole action was ordered:

Continue to a presumptive parole after the service of 48 months (August 10, 2002) with release through a community corrections center recommended for up to 120 days prior to the parole date with the highest level of supervision.

A presumptive parole date is conditioned upon your maintaining good institutional conduct and the development of a suitable release plan. Prior to release, your case will be subject to review to ascertain that these conditions have been fulfilled. NOTE: Pursuant to 28 C.F.R. §2.14-03, the Commission has issued a presumptive parole date in your case. The Commission will conduct a pre-release record review up to 9 months prior to the presumptive parole date. In order to complete this review, the Case Manager should submit an updated Progress Report to the Commission 10 months prior to the presumptive parole date. If there have been Disciplinary Reports since the Commission's last review, they should be attached to the Progress Report for the Commission's consideration. If the Commission has requested that a current psychological or psychiatric report be prepared for this review, it also should be attached.

**REASONS:**

Your parole violation behavior is rated as Category Two severity because it involved assault with no bodily injury. Your salient factor score (SFS-98) is 2. You have been in confinement as a result of your behavior for a total of 13 months as of September 25, 1999. Guidelines established by the Commission for revocation behavior indicate a customary range of 16-22 months to be served for cases with a good institutional adjustment and program achievement. In addition, you have committed behavior that constitutes new criminal conduct in a prison facility which is rated as Category Three severity because you possessed a weapon and you have committed behavior that constitutes new criminal conduct in a prison facility which is rated as Category One severity because it involved destruction of government property less than $2000, indicating a guideline range of 12-16 months and 0-8 months respectively, to be added to your original guideline range. Further, you have committed rescission behavior classified as administrative. Guidelines established by the Commission indicate a range of 0-2 months for non-drug related infractions and you have committed 1 non-drug-related infraction. Your aggregate guideline range is 28-48 months to be served. After review of all relevant factors and information presented, a decision outside the guidelines at this consideration is not found warranted.

As required by law, you have also been scheduled for a review hearing during September, 2001.

EXHIBIT
B

Date: November 15, 1999                         Clerk: adc

Page 1 of 3                                     JACKSON.198

# DISTRICT OF COLUMBIA REGISTER

## Publication Authority and Policy

The *District of Columbia Register* (ISSN 0419-439X) is published every Friday by the D. C. Office of Documents and Administrative Issuances under the authority of the *District of Columbia Documents Act*, D. C. Law 2-153, eff. March 6, 1979 (25 DCR 6960). The policies which govern the publication of the *Register* are set forth in the Rules of the Office of Documents (25 DCR 9855). Copies of the Rules may be obtained from the Office of Documents and Administrative Issuances. Rulemaking documents are also subject to the requirements of the *D. C. Administrative Procedure Act*, D. C. Code, § 1-1501 *et seq.*, as amended.

All documents published in the *Register* must be submitted in accordance with the applicable provisions of the Rules of the Office of Documents and Administrative Issuances. Documents which are published in the *Register* include: (1) Notices of final, proposed, and emergency rulemaking; (2) Acts and resolutions of the Council of the District of Columbia; (3) Notices of proposed Council legislation, Council hearings, and other Council actions; (4) Notices of public hearings; (5) Mayor's Orders, information on changes in the structure of the D.C. government, documents having general applicability and legal effect, and other notices and information of general public interest.

## Deadlines for Submission of Documents for Publication

All documents which require review or approval, such as rulemaking notices, must be submitted to the Office of Documents and Administrative Issuances by 12:00 Noon THURSDAY of the week preceding publication. All other documents must be submitted by 12:00 Noon FRIDAY of the week preceding publication. When the date of publication falls on a legal holiday, the *Register* is published on Thursday, and each deadline is one day earlier.

## Subscriptions and Other Information

Subscriptions to the *Register* are $150.00 per year postpaid. Checks or money orders should be made payable to "D. C. Treasurer" and sent to the Office of Documents and Administrative Issuances. Change of address forms should be submitted at least two weeks in advance in order to ensure continued delivery. Copies of the *Register* are available for public review at each branch of the D. C. Public Library. Each Advisory Neighborhood Commission is provided with a free copy of the *Register* for ANC and public use. The *Register* is printed at public expense, and there are no restrictions on the republication of any portion of the *Register*. News services are encouraged to publish all or part of the *Register*.

## Legal Effect of Publication — Certification

Except in the case of emergency rules, no rule or document of general applicability and legal effect shall become effective until it is published in the *Register*. Publication creates a rebuttable legal presumption that a document has been duly issued, prescribed, adopted, or enacted and that the document complies with the requirements of the *D. C. Documents Act* and *D. C. Administrative Procedure Act*. The Administrator of Documents hereby certifies that this issue of the *Register* contains all documents required to be published under the provisions of the *D. C. Documents Act*.

## DISTRICT OF COLUMBIA OFFICE OF DOCUMENTS AND ADMINISTRATIVE ISSUANCES

ROOM 520 - ONE JUDICIARY SQUARE - WASHINGTON, D.C. 20001 - (202) 727-5090

| ANTHONY A. WILLIAMS | ARNOLD R. FINLAYSON |
|---|---|
| MAYOR | ADMINISTRATOR |

PERIODICAL POSTAGE PAID AT WASHINGTON, D.C.
POSTMASTER: Send address changes to D.C. Register, Room 520, 441 - 4th St., N.W., Wash., D.C. 20001